Good morning, Your Honor. My name is Joseph Charles. I represent the plaintiffs in this matter. It's been an honor and a privilege for me to practice law for over 30 years, yet I've witnessed an alarming trend in the federal trial courts over the last four years. Now the same can be used to early terminate litigation on the basis of their ability to do so. And I went through all of the appellate cases I could find to see about a definition of justice. I was disappointed that we didn't find any definition, notwithstanding the fact in any appellate decision, that in the fall, all across our country, there's new law students that are admitted to our schools. And the charge that's given to them then is to seek justice. We are in a worthy, honorable profession. Well, let me ask you. Rhetoric's nice, but let me ask you a specific question. Let's assume, suppose the district court had made an error in her ruling about this evidence because the evidence went to something, okay? But there was obviously a bit, you had no other expert, is that right? Well, there was a treating doctor who was the doctor that put the nail in her leg. You didn't have another expert. Well, what other expert do you need? Well, that way, just a minute. Let me ask you a specific, I just want to know the answer. Did you have another expert? No. Okay. So if you had this expert's testimony in, but he had no, it was, it might have been, even if it was miscible evidence, it was very limited evidence. So if you, how would you have tied up the pieces at that point? In other words, why would summary judgment have been proper against you anyway, even if this evidence came in? Because the nail implant, which is just a metallic metal, was flawed. It was flawed when it was manufactured. Yes, but he said he didn't know how long it was supposed to last. He didn't know whether it caused anything. He didn't know whether, he basically knew that it could have, what I understood him to say is if it didn't have this problem at hand, it could have lasted a lot longer. How much longer? He didn't know how much, what the biological atmosphere had to say about that. He didn't know. So in other words, he, it may be that he was testifying to something relevant, but where was the rest of it? Well, the relevance, obviously the relevance is, is that it was a flawed piece of metal. We know that. And she says that on page 891. All right, fine. But what expert do you have to tie that up to the question of whether it was defective for the purposes for which it was made? Because the doctor impregnates our bodies and puts that on our bone to have the bone heal. And they certainly don't put it on the bone to break. And it broke within a little over a year. My understanding of the defense's position is yes, they put it in to have the bone heal. And therefore, the bone ordinarily should heal within a certain amount of time. And so it's, the nail only has to last that long. It's going to break eventually. And we all know it's going to break eventually is their position. So the fact that this expert says it will break, it broke sooner than it would have when he doesn't know how long that sooner is or what it has to do with the, or how long it was supposed to last, it seems to me you would need another expert. This expert may be fine, but you may need another one. No, Judge, and I'm sorry, but with all due respect, you're wrong. The evidence by the doctor is that they're very rarely break. They're not supposed to break. They're supposed to last generally from the treating doctor. He'd seen them five years or longer. Now, they do take them in an x-ray and see what's going on. But when it was manufactured wrong and it moves in your leg all of the time, it opened up. And when it opened up, it wasn't firm doing its job. And that's what the different tests and x-rays showed. And that's why a jury had a right to say that that was a flaw in the manufacturing of it. And it was wrong. What, who else would have come in and done this? No, wait a minute. You know, I'm in sympathy with you, but the flaw in the manufacturing has to do with the use of the nail. And he never tied up the flaw in the manufacturing to the use of the nail. We don't, it may have been flawed in a sense that it wasn't perfect, but we don't know from his testimony how that was tied up to the breaking of this nail at the time and under the circumstances. That's, you know, that's the deal. Even under the old rule, before the Daubert rule, whatever you want to call it, it's a question of relationship. It's not a question of the doctor being qualified or the expert being qualified. He certainly was, but the testimony, I can't see the relevance of it. The relevance is this again, Judge Bright, with all due respect. The nail is put in to help the stabilization of the bone. The treating doctor testified, the doctor from, I won't call it Barrels, but that's how it was, there in Phoenix, that when he saw the x-ray, the nail had fractured, they had to remove it. Now, why would they have to impregnate your body and remove it? And then, of course, they had a new processes put in this lady. So when the nail was first put in, it's common sense, is it not, that it's going to do the process of healing. And so what was the doctor found and what he, the engineer testified, is because it wasn't manufactured correctly, by the movement... The doctor didn't say anything about manufacturing correctly. The doctor didn't say, that nail should have lasted during this period of time, or he didn't put it together and say, the expert said that it was a defect, and in my opinion, another nail that I've seen would have lasted longer. If you had had that, I think you'd have had a little better case. We have that, Your Honor. The doctor testified, the medical doctor for the plaintiff testified, very rarely found a break, a break of this type of situation. Did Dr. Kumar have any expertise in biomechanical engineering or orthopedics? No, not in orthopedics, Your Honor. He was a metallurgical PhD. And I think that's the key here, is it not? Well, what am I going to do? When I went to my doctor and say, tell me about this metal, the doctor said, I'm a doctor, I'm a doctor. Okay, you put it in, you didn't expect it to break. There are biomedical engineers. I beg your pardon? There are biomedical engineers. There's a major at Stanford called biomedical engineering. I had an orthopedic surgeon and a PhD, and tied together, common sense, you wouldn't put a piece of metal in there and expect it to break in a little over a year. And we determined that it broke because it was manufactured improperly. For example, if you put a suture, you use a suture internally in somebody's body, you sew something up. My understanding is that those things, you know, last some amount of time. And in the meantime, the thing's supposed to heal, and then they dissipate. If somebody came in and said, you know, you could have made a stronger suture that would have lasted longer. That doesn't tell you anything unless you know how long it was supposed to last to facilitate the healing, right? Correct. What does it tell you? What's the relevance of it that you could have made a suture that would have lasted two years? Well, these devices called nails are designed to assist the person to get healed. They're not to break. They're not to break. What about my suture example? It's exactly the same thing, right? You use a suture to sew up something inside somebody's body, and in the meanwhile, the body's supposed to heal by itself, and eventually the suture breaks, or dissipates, or is absorbed. Now, unless we know how long it takes for the body to heal, it's not useful to know how long the suture lasted, or could have lasted. That's what the treating doctor follows the progress of the healing. And finally, when she felt the pain and discomfort, she went in and found that the nail had fractured. I understand, but do you have an expert? This is my question I began with. Do you have an expert, not necessarily this expert, but some expert, to testify about how long it should have taken for the healing to occur so that the nail no longer had to be there? Did you have such an expert? There is no such expert. There's none, because the treating doctor has to watch the process. And unfortunately, this lady didn't heal up as quickly as they wanted, so they were watching her. So each individual is different, and I'm not trying to be disrespectful. I'm just saying, I was educated. So is your position, and did you have any factual basis to present this, that it should have been able to last indefinitely? I don't think anybody can guarantee that, but with the doctor watching it, by x-raying it, they can see if it's doing its course of treatment or not. And in this case, they saw the fracture of it, so it wasn't. Of course, the doctor didn't know that until the patient said, I'm in pain. Why am I in this pain? And she went in for that. Listen, why I'm here is Rule 702. I just wanted to be in front of a jury. That's all I wanted. Let me just ask you about the rule here that we have to apply. The rule that we apply is, was there abusive discretion by the trial judge. Am I right? I think it was the rule of law. She ruled that I couldn't have a trial. That's the rule of law. But whether or not the testimony should be admitted under Daubert is a discretionary call by the district judge. We have to say it was an abuse of discretion in order to reverse them. Isn't that right? I don't think so. I think it's an issue of law. And I suggest you wait a minute. You're saying what? That as a matter of law, you were entitled to have that evidence introduced? Absolutely. Well, then that's a different rule than I'm familiar with. I wrote a book on evidence. I don't mean to mean that. Good morning, Judge Bright, Judge Verza, and Judge Nelson. May it please the Court. Steve Portel on behalf of Smith and Nephew Incorporated. I'm glad Judge Bright mentioned the standard of review. It is an abuse of discretion standard. It is highly deferential to the district court, Judge Bolton. There is a considerable factual record behind her decision, and I believe if you look at her 10, 11-page ruling, she goes through fairly painstakingly. This is what I'm having trouble with. It seems to me that the rule that the evidence was relevant to a link in the chain, to a link in the chain of a possible theory if there was other evidence for the other links in the chain, because he at least testified, she was certainly an expert on metallurgy, and he testified essentially that this nail would have lasted a lot longer had it been made otherwise, and also that it wasn't consistent with the drawings of the manufacturer, so there was a manufacturing defect. Now, whether any of that matters is a different question, but it could matter to a chain of evidence introduced at trial. So why is this an exclusion problem as opposed to a lack of evidence to support the position on summary judgment in general? Let me ask that question directly, which I'm sure you would appreciate. There are actually multiple parts to why Judge Bolton excluded Dr. Kumhoff from testifying. One of the issues that Kim Buck, Your Honor, is talking about is that it's not appreciably helpful. If you read Judge Bolton's decision, she's saying it's not appreciably helpful to say that the nail failed prematurely unless you can prove it. Well, I'm wondering about that. That depends on what else was put in in evidence. In the case of the Italian, Judge, all three orthopedic surgeons gave depositions in this case. Dr. Kumar, the metallurgist, was deposed twice. The short answer is the link had not been met by plaintiffs. So then he loses on summary judgment, but why is it an exclusion question? That's what I'm concerned about. The question of Judge Bolton's order goes to that. Here's why I wanted to start with abuse of discretion as the standard. Why Judge Bolton, in her order, and certainly it's consistent with the reported cases in this circuit and others, what she focused on was his admissions and his first and second deposition. If I may, I'd like to revisit those quickly with the Court. I understand. He kept saying it's outside my field of expertise. Well, not only that it's outside of his field of expertise, but his testimony doesn't answer the relevant question. The relevant question is, is this product defective? The relevant question can only be answered by the court. That's the ultimate question. But along the line to answering that question, the fact that this nail failed because of manufacturing defects, he says, and could have been made stronger, could certainly be relevant. Correct. But the relevant question, and it's not the ultimate question, is what's the fatigue life of these nails? That's a relevant question. And if you know what the fatigue life is, then you have to know whether this thing would have met the fatigue life. Correct. That's one of the relevant questions. One of the other relevant areas of inquiry is what kinds of biomechanical forces are being applied to this product. Are they outside the range of what is designed? Another relevant question. Because these aren't weight-bearing devices. These are actually devices. I think I heard Mr. Charles suggest that the nail is part of the process to create the healing. The healing that takes place is really the body's process. But it must be weight-bearing in the meanwhile. It certainly stabilizes the bone. But, in fact, the doctors who implant these devices, and I should add to the Court, I've actually had one of these devices in my body. These are not meant to be weight-bearing. These are actually meant to stabilize the bone. And you use crutches, walkers, until you reach a point where the bone, you actually have to go in for follow-up x-rays to determine when you can be fully. What about the manufacturing defect evidence? The notion that the manufacturer's drawers themselves showed a different radius than what this nail had. There's two responses to that. One is, I know your expert says that's not what it says, but that's a fact question for a jury. Well, in a way, it doesn't really reach. It wasn't critical to the judge's decision. Whether or not there was a departure from a design call-out has really nothing to do with why this nail failed or when it failed or whether it failed prematurely before its fatigue level. You don't think a jury could infer from the fact that the manufacturer intended it to have a certain radius and that it actually had a one-hundredth or one-tenth or whatever of that radius that there was a problem? Do I believe that a jury, if the jury was presented with that evidence, could consider it that way? A jury could. So why doesn't it get to hear that? He doesn't get to a hearing because the expert's testimony in this case, as Judge Bolton has laid out in her order, is not reliable on the relevant questions in this case. I'm sorry. I thought, let's just take very narrowly the question of this, I don't even know what it means, but I'm repeating the words, the radius of this nail. He said that the manufacturer's drawings required it to be, I don't know, .2 and it was actually .02 or something like that. Go ahead. What I was going to say is this really, that's kind of why this is a red herring issue. The manufacturing specification that's on the drawing has to do with snagging on surgical gloves. Well, excuse me. But that's a dispute. That's what your expert says and you could put that evidence on and he could say, no, as he said, no, in my experience, that's not the way manufacturers draw, write specifications and that goes to the jury. So I don't understand how you get to do that on summary judgment. Let me explain. Let's assume for a minute that, let's just assume for the sake of argument that the size of the radii that are asked to be kind of broken off this steel rod, by the way, I wanted to bring one in and Allie told me it would probably be hard bringing a metal pipe into the courtroom. The fact is, even if we were to allow Dr. Kumar, the metallurgist, to say there's a departure from the specification, there is absolutely no link for that testimony to say that's a defect, that's unreasonably defective. But I asked you previously whether a jury could infer that if somebody manufactures something at, you know, a huge percentage difference from what the manufacturer's specifications require, that there's likely something wrong with it. I don't think that's the record below the specification. At that time, you said yes. Well, I apologize. I could be a lot more sleep, Your Honor. But what I would let the Court know is, first of all, it is not a huge departure from the specification. The real question is whether or not Judge Bolton, again, armed with everything that she was given below, had made the correct call. It's whether she abused her discretion. And let me ---- I have a slightly unfeasible feeling that she skipped a step, that she would have been quite justified in granting summary judgment when all the evidence came in. You know, I'm glad you bring that up. We did. We were at the end of discovery. We had taken two depositions of the plaintiff. We had taken depositions of all the orthopedic surgeons. We had deposed Dr. Kumar twice. We had propounded an answer-written discovery, both sides. They're really, you know, candidly, in terms of the completeness of the record, we were there. And may I add ---- Had the summary judgment motions been made? No. It was made after the Dowling motion. Yes, but not before. Right. And, you know, in terms of sequencing that issue for the Court, I think once we had Dr. Kumar twice, received his reports, had all the medical records, which were considerable, you know, that following a particular procedure for that, I don't know that that was as important. Let me add, though, that one of the things that both of them considered was the fact that when we had talked to Dr. Kumar the first time, when we deposed him the first time, we asked him, are there any authoritative treatises out there that support or talk about failure analysis of metallic implants and orthopedic fixtures? And he gave us the name of an article. And I went and looked it up, and we read it. And that article provided a methodology for investigating this. And right off the bat ---- I'm sorry, I'm speaking too loud, Judge. I'm not speaking too loud. One of the things that that treatise provides is it provides a very comprehensive methodology, and it talks about examining the failure according to a variety of disciplines, including biological, surgical, and biomechanical knowledge. Right. Which goes back to my point, which is that they probably needed other experts in addition, and they didn't have them. And that may be a big problem, but I'm having a hard time seeing why this expert was excludable, why he didn't say anything relevant, as opposed to he didn't answer the ultimate question, and nobody else did. I guess what I hear the Court telling me is why didn't Mr. Charles petition the Court or ask for relief along the lines of, may I please add another expert? If that's your ruling, Judge, may I please add another expert? And candidly, Your Honor, based on Judge Bolton's decision, the answer is, first of all, he didn't ask for that relief. Second of all. And he's not asking for it now. He doesn't maintain it now. But second of all, even if you could find, I don't know that you could really find an orthopedic surgeon, a biomechanical expert, anybody who's going to agree that a nail is a weight-bearing device and needs to last indefinitely. And, again, remember this, too. This is very important to remember, that when we first talked to Dr. Kumar, even by the point of his second deposition, he hadn't considered any medical records. In fact, in his first deposition, he wasn't even aware that Ms. Stilwell had three prior surgeries with other products, other kinds of orthopedic fixtures, that had also failed, that had also pulled apart and broken, because her bones weren't healing. And there's plenty of evidence. We – the judge really didn't rely on it, but there's plenty of evidence in the record about why this lady's bones weren't healing. But thank you very much. I want to ask one other question. I'm just curious. I know you're over your time, but here's one way to look at it. The doctor gets up and testifies, in essence, well, I put in a lot of these nails, and they usually last long enough for the bone to heal. What – how long? Two years. And now the expert comes up and says, this was defective. And why isn't that relevant on the issue of negligence? And so it should not have been excluded, because there could be a tie-up between the failure and the defect. Judge Bright, that isn't the evidence in the case. The evidence in the case is not that the orthopedic surgeons testify, but these nails typically last two years. We're supposed to be doing this based on the evidence in the case. We're supposed to be doing it based on this piece of evidence and whether it's potentially relevant, because she excluded it. That's what's troubling me. In order to make that – again, we're going back to fatigue life, and that's – Judge Bright, that's what your question is, that there's testimony in the case about the fatigue life being two years. That is not – that is not the basis for the opinion in this case. The doctors actually did not commit to a time period. I'm here to go along with that, but that has nothing to do with exclusion or not. That has something to do with whether they make out a case. And this is an exclusion of evidence. It's not a summary judgment until after this evidence is out. So that's part of the problem. We'll look at the record. It's not – it's a tough kind of a case. But there is no evidence that the fatigue life should be two years. Okay. Thank you very much. The evidence in that case is a medical testimony, and contrary to what counsel just said, is on page 16 of our brief. We have a paragraph that quotes the doctor's testimony concerning the nails and their experience with the nails. Secondly, we have a lot of foreign objects in our bodies today. Be careful how you're handling this. Meaning the Parkinson decision is also metal.  That's metal. The appellate court allowed the metallurgical engineer to testify, and I was saying it wasn't the doctor, about the metals and all like that. So there's a lot of foreign things, pumps in our hearts, things that aren't human. What type of expert are we going to get? Well, as I say, there are people who are specifically experts. Next time, go to this call to Stanford Biomedical Engineering Department. Thank you very much. We're going to take a 10-minute break, and we'll be back shortly. Thank you. Thank you. Oh, he spilled it. It was too close with his pad, you know. He makes it for life. Yes, he does. Oh, you haven't seen anything. Oh, really? Just fall out of the chair. Oh, really? No. At least on the down circuit, yeah. Oh, so you're taking them? Okay. I wasn't going to take them as much. It's just sort of organizing them. You want me to put them near me? You can put them down here. Is that the easiest for you guys? They don't bother us. I'm just getting out of his way. Yeah. You can have another one. What? Thank you for your help. I think we're going to... Okay. Thank you. Right. Thank you.
judges: Bright , D.W. Nelson, Berzon